## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT  ☐ INFORMATION  ☐ INDICTMENT

☐ SUPERSEDING

### OFFENSE CHARGED

Count One: 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(viii), & 841(b)(1)(C) - Conspiracy to Distribute and Possess with the Intent to Distribute Heroin, Cocaine, and 50 Grams or More of a Mixture or Substance Containing Methamphetamine

☐ Petty
☐ Minor
☐ Misde- meanor
☒ Felony

PENALTY: Maximum penalties: minimum 5 years' prison; maximum 40 years' prison; 4 years to life of supervised release; $5 million fine; $100 special assessment; forfeiture; denial of federal benefits

---

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

**DEFENDANT - U.S**

LUIS CRUZ, aka "Chita"

DISTRICT COURT NUMBER

**4:20-mj-71278-MAG**

---

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY  ☐ DEFENSE   } SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant   } MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under   }

Name and Office of Person Furnishing Information on this form    DAVID L. ANDERSON

☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)    SAMANTHA BENNETT

---

### DEFENDANT

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Releas

**FILED**

Sep 08 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction   } ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution _____

Has detainer been filed?  ☐ Yes ☐ No   } If "Yes" give date filed _____

**DATE OF ARREST** ▶ _____ Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶ _____ Month/Day/Year

☐ This report amends AO 257 previously submitted

---

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS  ☐ NO PROCESS*  ☒ WARRANT    Bail Amount: NO BAIL

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Date/Time: _____    Before Judge: _____

Comments:

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT ☐ INFORMATION ☐ INDICTMENT

☐ SUPERSEDING

### OFFENSE CHARGED

Count One: 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(viii), & 841(b)(1)(C) - Conspiracy to Distribute and Possess with the Intent to Distribute Heroin, Cocaine, and 50 Grams or More of a Mixture or Substance Containing Methamphetamine

☐ Petty
☐ Minor
☐ Misde- meanor
☒ Felony

PENALTY: Maximum penalties: minimum 5 years' prison; maximum 40 years' prison; 4 years to life of supervised release; $5 million fine; $100 special assessment; forfeiture; denial of federal benefits

---

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

DEFENDANT - U.S

► LUIS RAMIREZ-CARRANZA, aka "Chino"

DISTRICT COURT NUMBER

**4:20-mj-71278-MAG**

---

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
  ☐ U.S. ATTORNEY ☐ DEFENSE
} SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under
} MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form   DAVID L. ANDERSON

☒ U.S. Attorney ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   SAMANTHA BENNETT

---

### DEFENDANT

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ►

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release

**FILED**

Sep 08 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges
} ☐ Federal ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer ☐ Yes
been filed? ☐ No
} If "Yes" give date filed

**DATE OF ARREST**   Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY**   Month/Day/Year

☐ This report amends AO 257 previously submitted

---

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS ☐ NO PROCESS* ☒ WARRANT   Bail Amount: NO BAIL

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time: _____ Before Judge: _____

Comments:

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT ☐ INFORMATION ☐ INDICTMENT

☐ SUPERSEDING

### OFFENSE CHARGED

Count One: 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(viii), & 841(b)(1)(C) - Conspiracy to Distribute and Possess with the Intent to Distribute Heroin, Cocaine, and 50 Grams or More of a Mixture or Substance Containing Methamphetamine

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: Maximum penalties: minimum 5 years' prison; maximum 40 years' prison; 4 years to life of supervised release; $5 million fine; $100 special assessment; forfeiture; denial of federal benefits

---

Name of District Court, and/or Judge/Magistrate Location

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

### DEFENDANT - U.S

▶ PHABEL GUTIERREZ, aka "Faja"

DISTRICT COURT NUMBER

**4:20-mj-71278-MAG**

---

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

ATF

☒ person is awaiting trial in another Federal or State Court, give name of court

Contra Costa County Superior Court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of: } SHOW DOCKET NO.

☐ U.S. ATTORNEY ☐ DEFENSE

☐ this prosecution relates to a pending case involving this same defendant } MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under }

Name and Office of Person Furnishing Information on this form     DAVID L. ANDERSON

☒ U.S. Attorney ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)     SAMANTHA BENNETT

---

### DEFENDANT

#### IS *NOT* IN CUSTODY

1) ☐ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release fro

**FILED**

Sep 08 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

#### IS IN CUSTODY

4) ☐ On this charge

5) ☐ On another conviction } ☐ Federal ☒ State

6) ☒ Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution
Martinez Detention Facility

Has detainer been filed? ☐ Yes ☒ No } If "Yes" give date filed

**DATE OF ARREST** ▶ Month/Day/Year 6/17/2020

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶ Month/Day/Year

☐ This report amends AO 257 previously submitted

---

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS ☐ NO PROCESS* ☒ WARRANT    Bail Amount: NO BAIL

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time:                          Before Judge:

Comments:

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT  ☐ INFORMATION  ☐ INDICTMENT

☐ SUPERSEDING

### OFFENSE CHARGED

Count One: 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(viii), & 841(b)(1)(C) - Conspiracy to Distribute and Possess with the Intent to Distribute Heroin, Cocaine, and 50 Grams or More of a Mixture or Substance Containing Methamphetamine

☐ Petty

☐ Minor

☐ Misdemeanor

☒ Felony

PENALTY: Maximum penalties: minimum 5 years' prison; maximum 40 years' prison; 4 years to life of supervised release; $5 million fine; $100 special assessment; forfeiture; denial of federal benefits

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

### DEFENDANT - U.S

▸ ANGEL MAGAÑA, aka "Villain"

DISTRICT COURT NUMBER

4:20-mj-71278-MAG

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY  ☐ DEFENSE
} SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant
} MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under
}

Name and Office of Person Furnishing Information on this form  DAVID L. ANDERSON

☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)  SAMANTHA BENNETT

### DEFENDANT

**IS *NOT* IN CUSTODY**

1) ☒ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▸

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release f

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction
} ☐ Federal  ☐ State

6) ☐ Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution

Has detainer been filed?  ☐ Yes  ☐ No
} If "Yes" give date filed

DATE OF ARREST ▸  Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ▸  Month/Day/Year

FILED

Sep 08 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS  ☐ NO PROCESS*  ☒ WARRANT  Bail Amount: NO BAIL

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Defendant Address:

Date/Time:  Before Judge:

Comments:

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT   ☐ INFORMATION   ☐ INDICTMENT
☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

### OFFENSE CHARGED

Count One: 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(viii), & 841(b)(1)(C) - Conspiracy to Distribute and Possess with the Intent to Distribute Heroin, Cocaine, and 50 Grams or More of a Mixture or Substance Containing Methamphetamine

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: Maximum penalties: minimum 5 years' prison; maximum 40 years' prison; 4 years to life of supervised release; $5 million fine; $100 special assessment; forfeiture; denial of federal benefits

### DEFENDANT - U.S

► ERNESTO MISSIEGO, aka "Lil Neto"

DISTRICT COURT NUMBER

**4:20-mj-71278-MAG**

### PROCEEDING

Name of Complainant Agency, Or Person (& Title, if any)

ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY   ☐ DEFENSE

SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form   DAVID L. ANDERSON

☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   SAMANTHA BENNETT

### DEFENDANT

**IS *NOT* IN CUSTODY**
1) ☐ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ►

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release

**IS IN CUSTODY**
4) ☐ On this charge

5) ☒ On another conviction
☐ Federal ☒ State

6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

Has detainer been filed? ☐ Yes   ☐ No
If "Yes" give date filed

DATE OF ARREST   Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY   Month/Day/Year

☐ This report amends AO 257 previously submitted

**FILED**

Sep 08 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS   ☐ NO PROCESS*   ☒ WARRANT   Bail Amount: NO BAIL

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance

Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:                    Before Judge:

Comments:

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT   ☐ INFORMATION   ☐ INDICTMENT

☐ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

### OFFENSE CHARGED

Count One: 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(viii), & 841(b)(1)(C) - Conspiracy to Distribute and Possess with the Intent to Distribute Heroin, Cocaine, and 50 Grams or More of a Mixture or Substance Containing Methamphetamine

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: Maximum penalties: minimum 5 years' prison; maximum 40 years' prison; 4 years to life of supervised release; $5 million fine; $100 special assessment; forfeiture; denial of federal benefits

**DEFENDANT - U.S**

▶ CHRISTIAN CERVANTES, aka "Bam Bam"

DISTRICT COURT NUMBER

**4:20-mj-71278-MAG**

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
   ☐ U.S. ATTORNEY   ☐ DEFENSE
}  SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under
}  MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form   DAVID L. ANDERSON

☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   SAMANTHA BENNETT

### DEFENDANT

**IS *NOT* IN CUSTODY**

1) ☐ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release

**FILED**

Sep 08 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

**IS IN CUSTODY**

4) ☐ On this charge

5) ☒ On another conviction   }  ☐ Federal  ☒ State

6) ☐ Awaiting trial on other charges
   If answer to (6) is "Yes", show name of institution

Has detainer been filed?  ☐ Yes  ☐ No   }  If "Yes" give date filed

**DATE OF ARREST** ▶   Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶   Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS   ☐ NO PROCESS*   ☒ WARRANT   Bail Amount: NO BAIL

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time:               Before Judge:

Comments:

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT　☐ INFORMATION　☐ INDICTMENT

☐ SUPERSEDING

### OFFENSE CHARGED

Count One: 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(viii), & 841(b)(1)(C) - Conspiracy to Distribute and Possess with the Intent to Distribute Heroin, Cocaine, and 50 Grams or More of a Mixture or Substance Containing Methamphetamine

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: Maximum penalties: minimum 5 years' prison; maximum 40 years' prison; 4 years to life of supervised release; $5 million fine; $100 special assessment; forfeiture; denial of federal benefits

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

### DEFENDANT - U.S

▶ FRANCISCO CANO, aka "Vaca"

DISTRICT COURT NUMBER

**4:20-mj-71278-MAG**

### DEFENDANT

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges
☐ Federal　☐ State

If answer to (6) is "Yes", show name of institution

Has detainer been filed?　☐ Yes　☐ No
} If "Yes" give date filed

**DATE OF ARREST** ▶　Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶　Month/Day/Year

**FILED**

Sep 08 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

### PROCEEDING

Name of Complainant Agency, Or Person (& Title, if any)

ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY　☐ DEFENSE
} SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant
} MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person Furnishing Information on this form　DAVID L. ANDERSON

☒ U.S. Attorney　☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)　SAMANTHA BENNETT

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS　☐ NO PROCESS*　☒ WARRANT　Bail Amount: NO BAIL

If Summons, complete following:
☐ Arraignment　☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Defendant Address:

Date/Time:　　　Before Judge:

Comments:

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT   ☐ INFORMATION   ☐ INDICTMENT
☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

### OFFENSE CHARGED

Count One: 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(viii), & 841(b)(1)(C) - Conspiracy to Distribute and Possess with the Intent to Distribute Heroin, Cocaine, and 50 Grams or More of a Mixture or Substance Containing Methamphetamine

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: Maximum penalties: minimum 5 years' prison; maximum 40 years' prison; 4 years to life of supervised release; $5 million fine; $100 special assessment; forfeiture; denial of federal benefits

### DEFENDANT - U.S

▶ ARMANDO NAVARRO-PINONES, aka "Viejon"

DISTRICT COURT NUMBER

4:20-mj-71278-MAG

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
    ☐ U.S. ATTORNEY   ☐ DEFENSE
}   SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant
}   MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person Furnishing Information on this form   DAVID L. ANDERSON
☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   SAMANTHA BENNETT

### DEFENDANT

**IS NOT IN CUSTODY**
1) ☒ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶
2) ☐ Is a Fugitive
3) ☐ Is on Bail or Release

**IS IN CUSTODY**
4) ☐ On this charge
5) ☐ On another conviction
6) ☐ Awaiting trial on other charges
} ☐ Federal ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer been filed?   ☐ Yes   ☐ No
}   If "Yes" give date filed

DATE OF ARREST ▶   Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ▶   Month/Day/Year

FILED

Sep 08 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS   ☐ NO PROCESS*   ☒ WARRANT   Bail Amount: NO BAIL

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance

Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:               Before Judge:

Comments:

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT   ☐ INFORMATION   ☐ INDICTMENT

☐ SUPERSEDING

### OFFENSE CHARGED

Count One: 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(viii), & 841(b)(1)(C) - Conspiracy to Distribute and Possess with the Intent to Distribute Heroin, Cocaine, and 50 Grams or More of a Mixture or Substance Containing Methamphetamine

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY:   Maximum penalties: minimum 5 years' prison; maximum 40 years' prison; 4 years to life of supervised release; $5 million fine; $100 special assessment; forfeiture; denial of federal benefits

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

### DEFENDANT - U.S

▸ SHEENA MIDDLETON, aka "China"

DISTRICT COURT NUMBER

**4:20-mj-71278-MAG**

### PROCEEDING

Name of Complainant Agency, Or Person (& Title, if any)

ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:

   ☐ U.S. ATTORNEY   ☐ DEFENSE

} SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

} MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form   DAVID L. ANDERSON

☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   SAMANTHA BENNETT

### DEFENDANT

**IS NOT IN CUSTODY**
   Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▸

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Relea

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction                     } ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges

   If answer to (6) is "Yes", show name of institution

Has detainer   ☐ Yes   } If "Yes" give date filed
been filed?   ☐ No

**DATE OF ARREST** ▸              Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▸   Month/Day/Year

FILED

Sep 08 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS   ☐ NO PROCESS*   ☒ WARRANT      Bail Amount: NO BAIL

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance

Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Date/Time:                    Before Judge:

Comments:

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT   ☐ INFORMATION   ☐ INDICTMENT

☐ SUPERSEDING

### OFFENSE CHARGED

Count One: 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(viii), & 841(b)(1)(C) - Conspiracy to Distribute and Possess with the Intent to Distribute Heroin, Cocaine, and 50 Grams or More of a Mixture or Substance Containing Methamphetamine

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: Maximum penalties: minimum 5 years' prison; maximum 40 years' prison; 4 years to life of supervised release; $5 million fine; $100 special assessment; forfeiture; denial of federal benefits

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

### DEFENDANT - U.S

▶ LUIS CABRERA, aka "Guero"

DISTRICT COURT NUMBER

**4:20-mj-71278-MAG**

### DEFENDANT

**IS NOT IN CUSTODY**

Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release f[...]

**FILED**

Sep 08 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction   } ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution _____

Has detainer been filed?  ☐ Yes  ☐ No   } If "Yes" give date filed _____

DATE OF ARREST _____ Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY _____ Month/Day/Year

### PROCEEDING

Name of Complainant Agency, Or Person (& Title, if any)

ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

_____

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

_____

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY   ☐ DEFENSE   } SHOW DOCKET NO. _____

☐ this prosecution relates to a pending case involving this same defendant   } MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under _____

Name and Office of Person Furnishing Information on this form   DAVID L. ANDERSON

☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   SAMANTHA BENNETT

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS   ☐ NO PROCESS*   ☒ WARRANT     Bail Amount: NO BAIL

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance

Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Date/Time: _____   Before Judge: _____

Comments:

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT   ☐ INFORMATION   ☐ INDICTMENT
☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

### OFFENSE CHARGED

Count Two: 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C) - Distribution of Methamphetamine

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: Maximum penalties: 20 years' prison; 3 years to life of supervised release; $1 million fine; $100 special assessment; forfeiture; denial of federal benefits

### DEFENDANT - U.S

▶ ALEXIS PEREZ, aka "Alexis Perez-Morales"

DISTRICT COURT NUMBER

## 4:20-mj-71278-MAG

### PROCEEDING

Name of Complainant Agency, Or Person (& Title, if any)

ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
   ☐ U.S. ATTORNEY   ☐ DEFENSE }
SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under }
MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form   DAVID L. ANDERSON

☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)   SAMANTHA BENNETT

### DEFENDANT

**IS NOT IN CUSTODY**
1) ☒ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction }   ☐ Federal   ☐ State

6) ☐ Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution

Has detainer been filed?   ☐ Yes   ☐ No }   If "Yes" give date filed

DATE OF ARREST ▶   Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ▶   Month/Day/Year

FILED

Sep 08 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
☐ SUMMONS   ☐ NO PROCESS*   ☒ WARRANT   Bail Amount: NO BAIL

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Defendant Address:

Date/Time:                   Before Judge:

Comments:

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT   ☐ INFORMATION   ☐ INDICTMENT
                                    ☐ SUPERSEDING

**── OFFENSE CHARGED ──**

Count Two: 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C) - Distribution of Methamphetamine

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY: Maximum penalties: 20 years' prison; 3 years to life of supervised release; $1 million fine; $100 special assessment; forfeiture; denial of federal benefits

**── PROCEEDING ──**

Name of Complainant Agency, Or Person (& Title, if any)

ATF

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
   ☐ U.S. ATTORNEY   ☐ DEFENSE
} SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant
} MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under
}

Name and Office of Person Furnishing Information on this form    DAVID L. ANDERSON

☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)    SAMANTHA BENNETT

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

**── DEFENDANT - U.S ──**

▶ BRIAN ALVARENGA, aka "Goofy"

DISTRICT COURT NUMBER

**4:20-mj-71278-MAG**

**── DEFENDANT ──**

**IS *NOT* IN CUSTODY**

1) ☒ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release fr

**FILED**

Sep 08 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction
} ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution

Has detainer been filed?   ☐ Yes   ☐ No
} If "Yes" give date filed

**DATE OF ARREST**   Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY**   Month/Day/Year

☐ This report amends AO 257 previously submitted

**── ADDITIONAL INFORMATION OR COMMENTS ──**

PROCESS:
☐ SUMMONS   ☐ NO PROCESS*   ☒ WARRANT       Bail Amount: NO BAIL

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance        *Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Defendant Address:

Date/Time:                    Before Judge:

Comments:

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the

Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Luis Cruz, Luis Ramirez-Carranza, Phabel Gutierrez, Angel Magaña, Ernesto Missiego, Christian Cervantes, Francisco Cano, Armando Navarro-Pinones, Sheena Middleton, Luis Cabrera, Alexis Perez, and Brian Alvarenga | ) ) ) ) ) ) | Case No.    **4:20-mj-71278-MAG** |

*Defendant(s)*

**FILED**

Sep 08 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___April 22, 2019 - May 29, 2020___ in the county of ___Contra Costa___ in the ___Northern___ District of ___California___, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Count One: 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(viii), & 841(b)(1)(C) | Count One: Conspiracy to Distribute and to Possess with the Intent to Distribute Heroin, Cocaine, and 50 Grams or More of a Mixture or Substance Containing Methamphetamine |
| Count Two: 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C) - Distribution of Methamphetamine | Count Two: Distribution of Methamphetamine |

This criminal complaint is based on these facts:

Attached Affidavit of Bureau of Alcohol, Tobacco, Firearms & Explosives Special Agent Richard P. Timbang

☒ Continued on the attached sheet.

Approved As To Form:

*/s/ Samantha Schott Bennett*
AUSAs SAMANTHA SCHOTT
BENNETT and JONATHAN U. LEE

Sworn to before me by telephone.

Date: ___September 8, 2020___

*/s/ Richard P. Timbang*
*Complainant's signature*

Richard P. Timbang, Special Agent, ATF
*Printed name and title*

*Judge's signature*

City and state: ___Oakland, California___     Hon. Donna M. Ryu, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Richard P. Timbang, a Special Agent with the United States Bureau of Alcohol, Tobacco, Firearms and Explosives, being duly sworn, state:

## I.   INTRODUCTION

1.   I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have been so employed since June 2004. I am presently assigned to the ATF Oakland Field Office in Oakland, California.  As a Special Agent with ATF, my responsibilities include conducting criminal investigations concerning alleged violations of Federal laws that encompass alcohol/tobacco diversion, arson, firearms, and explosive investigations as well as alleged violations of Federal narcotic laws.  I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program, and the ATF National Academy's Special Agent Basic Training, a combined twenty-three week regimen covering subject matters including, among other things, firearm identification, trafficking, and interdiction; confidential source recruitment/management and undercover techniques; and asset identification, seizure, and forfeiture.  Since graduating from the Academy, I have attended seminars and courses during which I received further training in the laws and investigative techniques relating to pen registers/trap and trace; phone toll analysis; the forensic extraction and analysis of digital evidence; Title III; electronic and physical surveillance; advance firearms trafficking; interstate nexus determination of firearms and ammunition; cyber and fraud crimes; financial investigations; asset forfeiture; and narcotics investigations

2.   As an ATF Special Agent, I have been involved in the execution of numerous state and federal firearm-and narcotics-related search and arrest warrants.  I have conducted multiple investigations of illicit drug and firearms trafficking, as well as the illegal possession of firearms.  As an investigator, I have observed targets sell, purchase, transport, transfer, and otherwise distribute narcotics and firearms.  These investigations have resulted in the arrests of multiple individuals and the seizure of various types of evidence, including, but not limited to, controlled substances, electronic devices containing communications between co-conspirators, packaging materials used to conceal controlled

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

substances, firearms, firearm accessories, ammunition, and pay-owe ledgers. I have participated in debriefs and proffers of defendants and confidential informants regarding their involvement in drug and gun trafficking activities, including methods of communicating with co-conspirators and efforts to conceal their illegal conduct from law enforcement.

3.      I am an investigative or law enforcement officer of the United States, within the meaning of Title 18 United States Code, Section 2510(7), and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

4.      I respectfully submit this Affidavit in support of a Criminal Complaint charging the following individuals (referred to herein collectively as, the "defendants") with Conspiracy to Distribute and to Possess with the Intent to Distribute Heroin, Cocaine, and 50 Grams or More of a Mixture or Substance Containing Methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(viii), and 841(b)(1)(C):

| 1 | Luis CRUZ, aka "Chita" |
| 2 | Luis RAMIREZ-CARRANZA, aka "Chino" |
| 3 | Phabel GUTIERREZ, aka "Faja" |
| 4 | Angel MAGAÑa, aka "Villain" |
| 5 | Ernesto MISSIEGO, aka "Lil Neto" |
| 6 | Christian CERVANTES, aka "Bam Bam" |
| 7 | Francisco CANO, aka "Vaca" |
| 8 | Armando NAVARRO, aka "Viejon" |
| 9 | Sheena MIDDLETON, aka "China" |
| 10 | Luis CABRERA, aka "Guero" |

5.      I further submit this Affidavit in support of a Criminal Complaint charging Alexis PEREZ, aka "Alexis Perez-Morales," and Brian ALVARENGA, aka "Goofy," with Distribution of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

6.      Because this affidavit is being submitted for the limited purpose of securing a criminal complaint and arrest warrants for the 12 individuals named herein, I have not included every fact known to me concerning this investigation.  I have set forth only those facts that I believe are necessary to establish probable cause to believe that (1) beginning on a date unknown, but no later than April 22, 2019, and continuing through at least May 29, 2020, in the Northern District of California, CRUZ, RAMIREZ-CARRANZA, GUTIERREZ, MAGAÑA, MISSIEGO, CERVANTES, CANO, NAVARRO, MIDDLETON, and CABRERA agreed with each other and with others to distribute and possess with the intent to distribute controlled substances, namely, heroin, cocaine, and 50 grams or more of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(viii), and 841(b)(1)(C); (2) that on or about May 6, 2020, in the Northern District of California, PEREZ sold a quantity of methamphetamine to another individual, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and (3) that on or about May 29, 2020, in the Northern District of California, ALVARENGA sold a quantity of methamphetamine to another individual, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

7.      Where statements made by other individuals are referenced in this Affidavit, such statements are described in sum and substance and in relevant parts only.  Similarly, where information contained in reports and other documents or records are referenced in this Affidavit, such information is also described in sum and substance and in relevant part only.  The information provided in this Affidavit is based on sources that I believe to be reliable,[1] including but not limited to, my review of surreptitious recordings of the targets of the investigation, law enforcement reports, and database records.  The investigation described herein was accomplished by the ATF, the Concord Police Department (CPD), the Drug Enforcement Administration (DEA), and the Federal Bureau of Investigation Safe Streets Task Force (FBI SSTF).  This Affidavit also includes information obtained through conversations with other law enforcement officers, including gang experts previously qualified

---

[1] The reliability of any confidential sources is addressed separately herein.

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

3

to testify as such in state courts, who are familiar with the Sureño street gang and its operation in the Contra Costa County area.  My understanding of the significance of certain facts and circumstances may evolve or change as new information is discovered in the course of the investigation.

## II.   APPLICABLE LAW

8.   Under 21 U.S.C. § 841, it is unlawful to distribute or possess with intent to distribute a controlled substance.

9.   Under 21 U.S.C. § 846, it is unlawful to conspire to distribute or possess with intent to distribute a controlled substance.

## III.   PROBABLE CAUSE

### A.   Background on the Sureños Street Gang as Implicated in this Investigation

10.   The ATF, DEA, CPD, and the FBI SSTF have been investigating the operation of the Sureño criminal street gang and its subsets in Contra Costa County.  ATF became involved in this particular investigation around April 2019.  Prior to this, CPD has been actively investigating the Sureño street gang since approximately January of 2018.  CPD initially investigated the gang due to an increase in gang activity, including homicides, robberies, assaults, and shootings occurring throughout Contra Costa County.  This investigation revealed that the Sureño criminal street gang has been responsible for many violent acts in Contra Costa County.  These crimes of violence are not only committed against rival Norteño gang members, but also innocent members of the community.

11.   The information included in Sections III.A and III.B is based in large part on information gathered from gang task force investigators and detectives familiar with the operation of the "South Side Locos" (SSL) Sureño subset in Concord, as well as how this gang subset fits into the larger Sureño network.  In particular, I have conferred with CPD Detective Josh Gilfry, who has been an officer for eight years and has twice testified in Contra Costa Superior Court as an expert in the Sureño criminal street gang and the SSL subset.  Detective Gilfry is currently assigned to the FBI Safe Streets Violent Gang Task Force, and previously worked for one year as a detective in CPD's Violence Suppression Unit, where his primary role was to investigate narcotic and gang crimes in Contra Costa County.  Prior

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

4

1    to joining CPD, Detective Gilfry worked as a Deputy with the Contra Costa County Office of the

2    Sheriff, where he worked at the Martinez Detention Facility and was assigned as the primary housing

3    unit deputy on Norteño and Sureño segregated housing units.

4        12.    The Sureño criminal gang has a direct relationship to the Mexican Mafia criminal

5    organization.  Their loyalty to the Mexican Mafia is often expressed by identifying their respective

6    gangs and adding "13" (for M—the 13th letter of the alphabet) or "X3" after their gang name.  Other

7    symbols associated to the gang are "XIII" "SUR" "Sur Trece."  Sureño gang members identify

8    themselves with common colors and symbols.  They associate with the color blue and will typically

9    wear blue clothing or carry blue bandanas in their possession.

10       13.    The Sureño criminal street gang and its subsets are typically involved in various illegal

11   activities, including homicide, firearm assaults, assault with deadly weapons, illegal firearm possession,

12   sales of firearms, methamphetamine sales, cocaine sales, heroin sales, marijuana sales, fentanyl sales,

13   robbery, carjacking, and stolen vehicles.  Crimes of violence, such as homicide, robbery, carjacking, and

14   assault with a firearm or deadly weapon, are the Sureño gang's means of maintaining its reputation for

15   violence against its rivals and within Contra Costa County communities.  The possession of firearms is

16   often a necessary tool for the Sureño criminal street gang, for both offensive and defensive use against

17   rival gangs.  Based on investigations in which I have been involved, as well as reports of other officers'

18   investigations, it is a standard practice for members and associates of the Sureño gang to use firearms

19   not registered to them, in order to avoid their being linked to the firearms later.  Crimes which generate

20   illicit revenue, such as narcotic sales and firearms sales are also essential to the gang's existence.  These

21   crimes provide funding for the gang's activities.  In addition, the income and power derived from such

22   illicit activities are a source of prestige within the gang.  On social media sites, it is common for Sureño

23   gang members to boast about money and power associated with such activities.

24       **B.    Sureño Subsets Based in Contra Costa County and the Extended Bay Areas**

25       14.    Some of the recognized Sureño subsets found in Concord, CA, are "South Side Locos"

26   (SSL); "Aztec Kings"; "Murder Mob /Murder Meadows"; "Brown Crowd Locos" (BCL); "Brown Pride

27

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
28   [**UNDER SEAL**]

5

1    Locos" (BPL); and "Beach Flats Sureños (BFS)."  Some of these subsets are described further herein, as

2    are other subsets found within other areas of Northern California.  These subsets discussed below are

3    highlighted because the investigation has revealed interactions between SSL and other Sureño subsets,

4    and it provides context for social media posts and other investigative details.

       a.    The <u>South Side Locos</u> (SSL) subset has maintained a stronghold in the Southern District

6    of Concord for over 25 years.  This particular area within the City of Concord, also

7    referred to as "The Boulevard" or "The Bully," consists primarily of the Monument Blvd.

8    corridor and its associated cross streets which includes, but is not limited to, the housing

9    and business complexes on Mi Casa Ct., Virginia Ln., Meadow Ln., Detroit Ave.,

10   Victory Ln., Reganti Pl., and Oakmead Dr. The Monument Blvd. corridor has also been

11   utilized by the Sureño criminal street gang as a main thoroughfare for narcotics and

12   firearms trafficking.

       b.    Sureño subsets in Concord utilize the business complex at 1500 Monument Blvd. in

14   Concord, CA (herein, "1500 Monument") to "post up" (i.e. hang out at a location) and

15   sell narcotics and firearms.[2]  Sureño gang members often refer to 1500 Monument as

16   "The Box" or "The block."  While numerous Sureño subsets operate out of 1500

17   Monument, it is primarily controlled by the South Side Locos subset.  Other Sureño

18   subsets must get permission to sell drugs in this area.  Sureño gang members work

19   cohesively in this area to further the enterprise of the Sureño gang as a whole.  It is

20   common for each member operating at a particular time to have a distinct role.  One

21   member may be in charge of hiding contraband in stash locations throughout the

22   complex, one member may be responsible for negotiating price, and another may act as a

23   lookout during the transaction.  During the federal and state investigation, most  of the

---

[2]    Based on my involvement in this investigation and my review of surveillance footage of 1500 Monument, I know that many of the defendants have frequented this address over an extended period of time.

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

6

1   defendants have been observed at 1500 Monument, including during drug and firearms

2   transactions described herein.

3      c.  There are at least two active Sureño gangs in the Vallejo area.  They are <u>Brown</u>

4   <u>Brotherhood</u> (BBH) and <u>Brown Crowd Locos</u> (BCL).  BBH and BCL members are

5   known to associate with MCR (Mexican Crazy Raza) members, which is a "Brown

6   Pride" gang.  Some MCR members have been known to leave their gang upon being

7   recruited into BCL or BBH. Many BCL and BBH members also claim WSV (Westside

8   Vallejo) while Norteños claim ESV (East Side Vallejo) to further represent their

9   neighborhood.  Some of these gangs also have subsets that are smaller groups of

10   members that work closely together or come from a more specific geographic location.

11      d.  The <u>Los Monkey's Trece</u> (LMT) subset of the Sureño criminal street gang was founded

12   sometime in the early 1990's in the Village Drive community in Brentwood, California.

13   As the city's Hispanic population increased, Mexican nationals settled in and around the

14   Village Dr. area, most of whom considered themselves Northerners.

15      e.  The <u>Little Town Sureños</u> (LTS) subset of the Sureño criminal street gang is based

16   primarily out of Bay Point, CA and claim Shore Acres as their gang territory.  Members

17   from the Little Town Sureños have also moved to other East County cities to include

18   Antioch Concord, and Pittsburg.

19      f.  The <u>Beach Flats Sureños</u> (BFS) subset is based in a neighborhood recognized by its

20   geographical nexus to the Santa Cruz Beach Boardwalk property.

21   **C.**   **<u>Investigative Tools</u>**

22   15.   Over the past two years, the investigative agencies have used various investigative

23   techniques in an effort to disrupt and dismantle the Sureño criminal street gang's activities in Contra

24   Costa County and elsewhere, including: (1) a state surveillance operation run at the direction of CPD,

25   which involved an investigation into the Sureño gang members trafficking drugs at the area of 1500

26   Monument, (2) a state interception of wire and electronic communication run at the direction of CPD

27

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.

28   [**UNDER SEAL**]

7

1  and the FBI SSTF, pursuant to a State investigation into the aforementioned homicides committed by

2  Sureño gang members;[3] and (3) a federal undercover operation, run at the direction of ATF, DEA, CPD,

3  and FBI SSTF, which included surveillance of undercover purchases of firearms and narcotics, as well

4  as recorded phone calls and undercover meetings with Sureño gang members.  Many of these operations

5  occurred at 1500 Monument, along the Monument Boulevard Corridor, and at other locations in eastern

6  Contra Costa County.

7          16.     During controlled undercover operations, the investigative agencies have used multiple

8  ATF and/or Concord Confidential Informants (ATF CIs 1 through 6, Concord CI and a DEA CI) to

9  purchase firearms and narcotics from many of the Sureño gang members.[i]

10         17.     During most of the undercover operations described herein, audio/video or audio

11 recording devices were used.  The majority of phone contacts between CIs and/or UCs and the

12 defendants made in connection with the firearm and drug transactions described herein were recorded.

13 There are some instances in which events or contacts (phone/social media) were not recorded due to

14 unavailability of a recording device and/or technical issues.  Where recordings were available, I have

15 reviewed them, and/or reviewed reports summarizing the recordings.  In instances where slang is used, I

16 have included my understanding of the slang in parentheses based on my training, experience, and

17 involvement in this investigation.  The CIs were also debriefed following each interaction, and reports

18 were created summarizing their descriptions of the events.  I have reviewed these reports, as well.

19 Surveillance was also conducted throughout the investigation in-person, as well as through pole cameras

20 at public locations along the Monument Boulevard corridor, including over the parking lots of 1500

21 Monument.

22         18.     The defendants have been identified as Sureño gang members or associates of the gang

23 through a variety of means.  As examples, the defendants have been observed throughout this

24

25 ───────────────
         [3] This Affidavit does not rely upon information gathered from the state wiretap to establish
26 probable cause, but includes its existence to provide the Court with context for the scope of the law
   enforcement investigative efforts.

27

28 TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
   [**UNDER SEAL**]

                                                      8

investigation congregating on a frequent and regular basis together at 1500 Monument or elsewhere along the Monument Boulevard corridor in Concord, CA. The defendants have posted pictures and videos on social media where they are depicted together and with other known gang members, wearing blue clothing, showcasing gang tattoos, and using known Sureño or South Side Locos hand signs. The defendants have posted and/or appeared in music videos touting the Sureño gang and describing the gang's activities. Several of the defendants have explicitly identified themselves, either on social media or to the CIs, as members of the Sureños, South Side Locos, or other Sureño subsets. During interactions with CIs, some of the defendants have used the slang to refer to their gang affiliation, including describing each other as "homies." The investigation has also revealed evidence that the defendants work together to sell drugs and firearms from their hub at 1500 Monument and elsewhere.

**D.**    **Table Summarizing Transactions Conducted With the Defendants Via the Undercover Operation**

19.    The following table summarizes the undercover transactions conducted as part of the federal investigation, including listing the defendant(s) involved in supplying, delivering, receiving payment and/or otherwise participating in the listed narcotics and firearms transactions. After the table, I provide a description of each transaction, to include quantities of drugs and types of firearms involved.

| Date of Transaction | Defendant | Purchase[4] |
|---|---|---|
| 4/22/2019 | RAMIREZ-CARRANZA | Handgun |
| 4/22/2019 | CRUZ | 55.1 grams methamphetamine |
| 4/30/2019 | RAMIREZ-CARRANZA | Handgun |
| 5/8/2019 | CRUZ | 111.4 grams methamphetamine |
| 5/9/2019 | RAMIREZ-CARRANZA, CRUZ, and Individual-1 | Handgun and 27.4 grams methamphetamine |
| 5/29/2019 | CRUZ | 223.3 grams methamphetamine |
| 7/3/2019 | CERVANTES, GUTIERREZ and CRUZ | 56 grams methamphetamine |
| 7/16/2019 | CRUZ | 445.7 grams methamphetamine |

[4] All drug weights described herein are net weights. The drugs were tested by the DEA Western Regional Laboratory and confirmed as the listed substances.

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

9

| 7/17/2019 | RAMIREZ-CARRANZA | Two Firearms |
|---|---|---|
| 7/23/2019 | RAMIREZ-CARRANZA and Individual-2 | Handgun, Glock auto switch, AR style short barrel rifle |
| 8/21/2019 | RAMIREZ-CARRANZA | AK style pistol |
| 9/6/2019 | CRUZ | 892.2 grams methamphetamine and firearm |
| 10/15/2019 | CERVANTES, CANO, and NAVARRO | 112.5 grams methamphetamine |
| 10/18/2019 | CERVANTES, CANO, and GUTIERREZ | 25.7 grams heroin |
| 10/30/2019 | CERVANTES, CANO, and GUTERREZ | 84.7 grams methamphetamine |
| 10/30/2019 | CERVANTES, GUTIERREZ, and CRUZ | 446 grams methamphetamine |
| 12/4/2019 | GUTIERREZ | Handgun |
| 1/3/2020 | NAVARRO | 55.8 grams methamphetamine |
| 2/12/2020 | MISSIEGO and NAVARRO | handgun, 20.937 grams, and sample meth |
| 2/12/2020 | MISSIEGO and MAGAÑA | handgun |
| 2/27/2020 | CABRERA and MISSIEGO | attempted drug transaction |
| 3/11/2020 | CERVANTES, MAGAÑA, and RAMIREZ-CARRANZA | 7.26 grams methamphetamine |
| 3/20/2020 | MAGAÑA and MIDDLETON | 54.378 grams methamphetamine |
| 3/27/2020 | MIDDLETON | 83.092 grams methamphetamine |
| 5/6/2020 | PEREZ | 0.431 grams methamphetamine |
| 5/8/2020 | CABRERA | attempted drug transaction |
| 5/14/2020 | CANO | 2.888 grams methamphetamine |
| 5/15/2020 | MAGAÑA | meet & payment of $100 |
| 5/15/2020 | CABRERA | 111.4 grams methamphetamine |
| 5/15/2020 | CANO | 117.817 grams methamphetamine |
| 5/28/2020 | RAMIREZ-CARRANZA | 0.549 grams cocaine |
| 5/29/2020 | RAMIREZ-CARRANZ & GUTIERREZ | 13.672 grams methamphetamine |
| 5/29/2020 | ALVARENGA | 0.598 grams methamphetamine |
| 5/29/2020 | RAMIREZ-CARRANZA | 0.881 grams cocaine |

1

### E.   Operation of the Conspiracy

2   20.   During the course of this investigation, the defendants typically contacted the CIs via

3   Snapchat or via phone in order to coordinate the purchase of firearms and controlled substances.  The

4   defendants also loitered in the parking lot at 1500 Monument Boulevard, or in the parking lot of a Motel

5   6 in Pittsburg, CA, to sell drugs.  CIs approached the defendants, who then offered to sell controlled

6   substances, including methamphetamine, heroin, and cocaine.

7   21.   The defendants sold drugs in a variety of ways.  On some occasions, one of the

8   defendants carried or otherwise possessed of quantities of controlled substances to sell directly to the

9   CIs.  On other occasions, one of the defendants would hold the controlled substances, while another

10   defendant would negotiate prices, and sometimes a third defendant would do the actual exchange.  On

11   many occasions, when the CIs coordinated the purchase of drugs or guns in advance, the defendants

12   indicated that they needed to acquire the drugs from their suppliers – who were often other members of

13   this conspiracy – and would do so either before or during their meetings with the CIs.

14   22.   I know, based on my training and experience and from conferring with a DEA agent, that

15   the amount of a typical methamphetamine "dose" can vary based on the user's tolerance and frequency

16   of use, as well as the purity of the substance.  However, a reasonable range for a dosage unit of

17   methamphetamine would be between .1 and one gram.  During the course of this investigation, the

18   defendants sold various quantities of methamphetamine, ranging from approximately half a gram for

19   $20, to approximately two pounds for $5,600.  Assuming a conservative .5 gram dose, the largest

20   discrete sale in this case – 892.2 grams by CRUZ on September 6, 2019 – comprised over 1,784

21   individual doses of methamphetamine.  The defendants also sold heroin and cocaine, and they sold

22   firearms, including machineguns, to the same customers to whom they sold controlled substances.

23   ### F.   Drug and Gun Transactions Involving the Defendants

24   23.   Beginning on a date unknown, but no later than April 22, 2019, and continuing through at

25   least May 29, 2020, in the Northern District of California, CRUZ, RAMIREZ-CARRANZA,

26   GUTIERREZ, MAGAÑA, MISSIEGO, CERVANTES, CANO, NAVARRO, MIDDLETON, and

27

28   TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

1  CABRERA agreed with each other and with others to distribute and possess with the intent to distribute

2  controlled substances, namely, methamphetamine, heroin and cocaine, in violation of 21 U.S.C. §§ 846,

3  841(b)(1)(B)(viii), and 841(b)(1)(C).

4       24.    As described further herein, PEREZ and ALVARENGA also distributed quantities of

5  methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

6            ***1.***     ***April 22, 2019: Purchase of 55.1 Grams Methamphetamine from CRUZ***

7       25.    On or about **April 22, 2019**, CI-1 coordinated the purchase of methamphetamine from

8  CRUZ via Snapchat.  I know that CRUZ is a documented SSL gang member with the CPD.  On or about

9  January 20, 2015, CPD contacted CRUZ, MAGAÑA and another person.  During the encounter, CRUZ

10  admitted that he was an active member of the Sureño criminal street gang.  CRUZ, MAGAÑA, and the

11  third person were wearing blue clothing, including blue shoes, hats, and jewelry.  CRUZ has also been

12  depicted in several photos with other Sureño gang members in pictures posted to Instagram, including

13  the following photo posted to MAGAÑA's Instagram account.[5]  In the image below, CRUZ is the

14  second individual from the left.  MAGAÑA is the third individual depicted from the left and is wearing

15  a long necklace-like item around his neck.  The image is accompanied by the various hashtags, which I

16  know are commonly used to associate a post with a specific topic.  Here, the image is accompanied by a

17  variety of hashtags, including #concord #ganggang #beachflats.  As mentioned above, Beach Flats is a

18  related extension of the gang based in Santa Cruz, and Concord is home to the South Side Locos (SSL).

19  The four are standing at the grave of an individual who I believe to be Ramiro MAGAÑA, who was the

20  founder of the SSL subset of the Sureños.

21  ///

22  ///

23  ///

24

25    [5]     The faces of individuals not charged in this complaint have been obscured in photographs
26  included in this Affidavit.

27    Timbang Aff. in Support of Criminal Compl.
28  [**Under Seal**]



26.     On or about April 22, 2019, CRUZ sold **55.1 grams (net weight) methamphetamine** to CI-1 and CI-2 for $500 in a parking lot at 3701 Treat Blvd, Concord, CA.  During the transaction, CRUZ informed CI-1 and CI-2 that his "boy" wanted "5" (i.e., $500) for the methamphetamine instead of the initial price of $450.  CRUZ also informed the CIs that if they ordered "4" (i.e., four ounces of methamphetamine) the price would be cheaper.

### 2.     *May 8, 2019: Purchase of 111.4 Grams Methamphetamine from CRUZ*

27.     On or about **May 8, 2019**, CRUZ sold **111.4 grams (net weight) methamphetamine** to CI-1 and CI-2 for $900 at a parking lot at 3701 Treat Blvd, Concord, CA.  During this transaction, ATF CI 2 asked CRUZ if the methamphetamine was always going to be this good.  CRUZ explained to ATF CI 2 that his methamphetamine would always be this good, if not better.

### 3.     *May 9, 2019: Purchase of 27.4 Grams Methamphetamine and Firearm from RAMIREZ-CARRANZA, CRUZ, and Individual-1*

28.     Prior to approximately May 9, 2019, CI-1 coordinated the purchase of a firearm and methamphetamine from RAMIREZ-CARRANZA via Snapchat.  I know that RAMIREZ-CARRANZA

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

is a SSL member, and is frequently present with other SSL and other Sureño gang members at 1500

Monument.  RAMIREZ-CARRANZA has also been depicted in several photos posted by other Sureño

gang members to social media.  The posts include the following photo posted to MAGAÑA's account,

which is tagged with the location of "Concord – Monument Blvd," captioned, "Whole lotta gang shit,"

and includes the hashtag "#monumentblvd."  The individuals depicted in the photograph from left to

right: (1) unknown adult male (displaying an SSL gang hand sign), (2) unknown adult male in button up

shirt, (3) an identified individual, referred to herein as "Individual-2" (displaying an SSL gang hand

sign), (4) Luis CABRERA (displaying the LMT gang hand sign), (5) unknown Hispanic male (he is

making either a number 3 or M hand sign—which would signify a 3 for MS-13 or M or Mafia), (6)

known LTS gang member who appears to be making the number 3 with his left hand and holding a blue

bandana), (7) MAGAÑA (who is appearing to make a "b" hand sign which would signify beach flats

Sureño), (8) another known South Side Locos gang member), and (9) RAMIREZ-CARRANZA (who is

making a letter 3 with his hand).  The image depicts RAMIREZ-CARRANZA making a "3" with his

hand, as well as Indivdiual-2 (displaying an SSL hand sign), CABRERA (displaying the LMT hand

sign), and MAGAÑA:



29. During previous undercover operations, RAMIREZ-CARRANZA has also sold firearms to ATF CIs:

     a. On or about April 22, 2019, RAMIREZ-CARRANZA sold a Glock handgun to CI-1 in exchange for $1,000.  The transaction was coordinated on Snapchat and took place outside of RAMIREZ-CARRANZA's home in Concord, CA.

     b. On or about April 30, 2019, RAMIREZ-CARRANZA sold an SD40 Smith and Wesson handgun to CI-1 and CI-2 in exchange for $1,000.  The transaction was coordinated on Snapchat and took place outside of RAMIREZ-CARRANZA's home in Concord, CA.

30. On or about **May 9, 2019**, CI-1 and CI-2 met with RAMIREZ-CARRANZA outside his residence in Concord, CA.  When the CIs arrived, they observed RAMIREZ-CARRANZA exit a blue Ram truck, registered to an identified individual, referred to herein as "Individual-1."  Individual-1 is a suspected co-conspirator of the defendants listed in this Affidavit.  Individual-1 was sitting in the driver seat and Luis CRUZ was sitting in the rear passenger seat of the truck.  RAMIREZ-CARRANZA then grabbed a firearm from a Honda sedan parked in his driveway before getting into the CI's vehicle. RAMIREZ-CARRANZA then sold a **P80 handgun and 27.4 grams (net weight) methamphetamine** to CI-2 for $1,000 and $300, respectively.

     a. CI-1 stood outside the vehicle during the transaction.  While RAMIREZ-CARRANZA was inside the CIs' vehicle, CRUZ exited Individual-1's truck and approached CI-1 and advised that he had oxycodone pills for sale.  CRUZ then got back into Individual-1's truck.

     b. CI-1 and CI-2 discussed purchasing additional firearms with RAMIREZ-CARRANZA, including fully automatic assault rifles, and additional methamphetamine.  RAMIREZ-CARRANZA indicated that his source was in the blue truck, where Individual-1 and CRUZ were sitting.  RAMIREZ-CARRANZA then left the CIs' vehicle and reentered Individual-1's truck.

///

c.  Following the transaction, CRUZ contacted CI-1 on Snapchat and advised that RAMIREZ-CARRANZA had gotten the methamphetamine from him (i.e. CRUZ).  More specifically, CRUZ asked CI-1," Is good g why u aint let me know ur boy wanted another zip? Did he not like mine?"  CI-1 responded to CRUZ that his/her "boy" just wanted to test out other suppliers.  CRUZ responded, "I feel it hah he copped from me anyway cbino hit me for the zip lol."  Based on my training and experience, I believe CRUZ was telling CI-1 that CRUZ supplied RAMIREZ-CARRANZA with the methamphetamine sold to CI-1 (i.e., he "hit me for zip").

### 4.  *May 29, 2019: Purchase of 223.3 Grams Methamphetamine from CRUZ*

31.  In late May 2019, CRUZ communicated repeatedly with CI-2 by telephone and CRUZ touted the quality of his methamphetamine for sale.   Ultimately, CRUZ arranged for the sale of a half-pound of methamphetamine to CI-2.  On or about **May 29, 2019**, CRUZ sold **223.3 grams (net weight) methamphetamine** to CI-2 for $1,900 at a parking lot at 3701 Treat Blvd, Concord, CA.  During their conversations, CRUZ informed CI-2 that his "boy" had increased the price and wanted "2" (i.e., $2,000) for a half-pound of methamphetamine, but he was able to get it for $1,900.  Further, CI-2 asked about buying a whole "p" (i.e., one pound of methamphetamine).   CRUZ explained he could probably get his "dude" (i.e., his drug source) to take another $50 off each half-pound, but he did not want to make any promises until he talked to his source.  Based on my training and experience, I know that drug dealers often work with the same drug suppliers and must coordinate to ensure the timing of their resupply coincides with a larger transaction.

### 5.  *July 3, 2019: Purchase of 56 Grams Methamphetamine from GUTIERREZ, CERVANTES, and CRUZ*

32.  Prior to July 3, 2019, CI-1 coordinated the purchase of methamphetamine from GUTIERREZ via Snapchat.  I know that GUTIERREZ is a documented SSL gang member.  GUTIERREZ has a spade with the number 13 in the middle tattooed on his left arm, "Blvd" tattooed on his neck, and "SS" tattooed on his chest.

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

16

33.     On **July 3, 2019**, CI-1 met with GUTIERREZ and CERVANTES in the parking lot of GUTIERREZ's apartment complex in Concord, CA.  CI-1 confirmed the price with GUTIERREZ, who then said something to CERVANTES.  CERVANTES then pulled a gray sock, holding **56 grams (net weight) methamphetamine**, from his pants pocket and handed it to CI-1.  After the exchange, GUTIERREZ asked if CI-1 needed a ride.  CRUZ, who had been parked in a green Honda in the parking lot during the sale, then pulled his car up to CI-1 and talked to CI-1 about the sale of marijuana.  CI-1 then observed GUTIERREZ and CERVANTES get into CRUZ's vehicle before leaving the location.  Based on my training and experience, I believe GUTIERREZ, CERVANTES, and CRUZ worked together to coordinate the drug transaction.

### 6.     *July 16, 2019: Purchase of 445.7 Grams Methamphetamine from CRUZ*

34.     Between July 6, 2019, and July 16, 2019, CI-2 coordinated the purchase of a pound of methamphetamine from CRUZ via telephone.  CRUZ negotiated the price with CI-2 and indicated that he (CRUZ) was able to convince his source – his "boy" – to lower the price.  On or about **July 16, 2019,** CI-2 gave CRUZ $3,200 in exchange for **445.7 grams (net weight) methamphetamine**.

### 7.     *July 17, 2019 Purchase of Two Pistols from RAMIREZ-CARRANZA*

35.     On July 17, 2019, RAMIREZ-CARRANZA sold a Glock model 19 semi-automatic pistol and a SD40 Smith and Wesson semi-automatic pistol to ATF CI 1 and ATF CI 3 in exchange for $1,000.  The transaction was coordinated on Snapchat and took place outside of RAMIREZ-CARRANZA's home in Concord, CA.

### 8.     *July 23, 2019: Purchase of Short-Barreled Rifle, Glock Handgun, and Glock Conversion Switch from RAMIREZ-CARRANZA and Individual-3*

36.     On or about **July 23, 2019**, CI-1 and CI-3 purchased a short barreled rifle, Glock handgun, and a "Glock" full auto conversion switch for $3,500 from RAMIREZ-CARRANZA and an identified individual ("Individual-3") at Individual-3's home in Bay Point, CA.  RAMIREZ-CARRANZA coordinated the purchase on Snapchat and phone.  During the transaction, CI-3 handed money to RAMIREZ-CARRANZA, who gave it to Individual-3's to count.

1

2

### 9. *August 21, 2019: Purchase of AK-style Firearm from RAMIREZ-CARRANZA*

3

37.     On or about August 21, 2019, RAMIREZ-CARRANZA sold an AK style firearm to CI-1

4   and CI-3 in exchange for $2,500.  RAMIREZ-CARRANZA advertised the firearm as fully automatic.

5   The transaction took place in front of RAMIREZ-CARRANZA's home in Concord, CA.

6

### 10. *September 6, 2019: Purchases of 890 Grams Methamphetamine and Handgun from CRUZ*

7

8

38.     On or about **September 6, 2019**, CI-2 met with CRUZ at 3701 Treat Boulevard,

9   Concord, CA and purchased approximately a pound of methamphetamine for $2,800 and **a "ghost"**

10  **Glock style handgun** for $1,300 from CRUZ.  Later that same day, CI-2 purchased an additional pound

11  of methamphetamine from CRUZ for $2,800.  In total, CRUZ sold **892.2 grams (net weight)**

12  **methamphetamine** to CI-2 on that date.

13

39.     A "ghost gun" is a street term used to describe a Privately Made Firearm (PMF) that has

14  been made from an unfinished receiver and that is absent of manufacturer's marks of identification (i.e.,

15  serial number).  A firearm without a serial number makes it harder for investigators to trace the firearm

16  to an individual; however, the recovery location, firearm description, possessors, and associates may

17  link the firearm to other traced crime guns or criminals.

18

### 11. *October 15, 2019: Purchase of 112.5 Grams Methamphetamine from CERVANTES, CANO, and NAVARRO*

19

20

40.     Between October 13, 2019, and October 15, 2019, CI-1 negotiated the purchase of a

21  quarter-pound of methamphetamine from CERVANTES via Snapchat.  I know that CERVANTES is

22  known to be an active SSL member.  Additionally, CI-1 identified CERVANTES to be a Sureño gang

23  member based on CI-1's knowledge of the gang.  CERVANTES has three dots tattooed on his face, a

24  common tattoo amongst Sureño gang members to show allegiance to the gang.

25

41.     I know that CANO is known to CPD to be a Sureño gang member.  CANO has "SSL"

26  tattooed on his upper back and the number "3" tattooed on his left leg.  CANO has admitted to a CPD

27

28

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

18

1    detective in the past that he is an active South Side Locos Sureño gang member and would never drop

2    out of the gang.  In May of 2009, CANO was at a 7-11 store parking lot in Concord on Monument

3    Boulevard with another Sureño gang member when he observed two teenage minor age males exit the

4    store. One of the males was wearing red shoes; I know the color of the Norteño gang to be the color red

5    and Norteños to commonly wear red clothing to identify themselves.  CANO followed the males to the

6    bus stop.  He then grabbed money from one of the males and began to yell at them for disrespecting the

7    neighborhood for wearing red shoes.  Next, CANO ripped the red shoes off of one of the males and

8    threw them into the gutter.  When the male demanded his money back, CANO pulled out a knife and

9    chased the victim around the bus stop.  CANO was convicted of California Penal Code § 211 and

10   sentenced to seven years state prison / suspended in connection with this incident.  CANO was held in

11   county jail for one year and ordered to register as a gang member upon release.  CANO is currently a

12   gang registrant, pursuant to California Penal Code § 186.30 (Docket# 05-091042-2).

13       42.    I know based on this investigation and reviewing prior police reports that NAVARRO

14   associates with Sureño gang members.

15       43.    On **October 15, 2019**, CERVANTES initially told CI-1 to meet at a McDonalds in

16   Concord, CA to conduct the anticipated drug transaction, but then CERVANTES advised that he would

17   provide another address at a house behind the restaurant because, "They don't want to take it over

18   there."  I believe CERVANTES' use of the word "they" is consistent with CERVANTES working with

19   others to facilitate the drug transaction.  Further, CERVANTES told CI-1 and CI-3 that his drug supplier

20   was his "cuñado," which I know means "brother-in-law" in Spanish.  I have learned through this

21   investigation and from speaking with other investigators that CERVANTES' sister is in a relationship

22   with CANO.  Thus, I believe CERVANTES' source of drugs is likely CANO.

23       44.    CERVANTES redirected CI-1 and CI-2 to an address on Nicholas Drive in Concord, CA,

24   which is next door to NAVARRO's home.  When CI-1 and CI-3 arrived at the location, they observed

25   NAVARRO and CI-1 contacted NAVARRO.  At that time, NAVARRO denied knowing

26   CERVANTES.  A short while later, CERVANTES met with the CIs in their vehicle, and directed the

27

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
28   [**UNDER SEAL**]

CIs to park in the vicinity of a white pickup truck where NAVARRO and CANO were standing together.  CI-1 observed NAVARRO open the front passenger door of the truck and remove a clear plastic bag of crystallized substance, which NAVARRO then handed to CANO.  CANO then walked to the front passenger seat of the CIs' vehicle, opened the door and handed the bag to CERVANTES.  CERVANTES then gave the CIs the bag containing **112.5 grams (net weight) methamphetamine** in exchange for $1,000.  Based on my training, experience, and common sense, I believe CERVANTES, NAVARRO, and CANO worked together to facilitate the drug transaction.

> ### 12.  *October 18, 2019: Purchase of 25.7 Grams Heroin from CERVANTES and GUTIERREZ*

45.     Between October 15, 2019, and October 18, 2019, ATF CI 1 negotiated the purchase of an ounce of heroin from CERVANTES via Snapchat.  On **October 18, 2019**, GUTIERREZ drove CERVANTES and CANO to the pre-determined meeting location in Concord, CA.  CANO stood outside of their vehicle for the duration of the transaction, while GUTIERREZ remained in the car.  CERVANTES walked over to the CI vehicle and placed a plastic bag containing **25.7 grams (net weight) heroin** into the trunk, in exchange for $1,000.  CERVANTES and CANO then got back into GUTIERREZ's car, and they left the location together.

> ### 13.  *October 30, 2019: Purchase of 84.7 Grams Methamphetamine from CERVANTES, CANO, and GUTIERREZ*

46.     Between approximately October 21, 2019, and October 30, 2019, CI-3 negotiated the purchase of methamphetamine from CERVANTES via phone.  During these negotiations, CERVANTES indicated that he was getting methamphetamine from the same "person" with the same "plug" (i.e. source of supply) as for the October 15 transaction, but that "they" only had a quarter-pound of methamphetamine available.  CERVANTES also indicated that he had another source who had a "whole thing" (i.e. one pound) for $3,200.

47.     On or about **October 30, 2019**, DEA observed CANO meet with several unidentified individuals outside of NAVARRO's home and then connect with CERVANTES.  CERVANTES and

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

1  CANO then parted company, and CERVANTES called CI-3 to arrange the location of the planned

2  transaction.

3        48.      A short time later, CERVANTES and GUTIERREZ walked into the parking lot of 2060

4  Monument Boulevard in Concord, CA.  Separately, CANO drove into the parking lot and parked his car.

5  CANO and CERVANTES walked together to a corner of the parking lot, where CANO handed an

6  object to CERVANTES.  CERVANTES then walked to CI-3's vehicle and got into the front passenger

7  seat.  CERVANTES gave CI-3 **84.7 grams (net weight) methamphetamine** in exchange for $600.

8  During the transaction, GUTIERREZ remained on foot in the parking lot.  Based on my training and

9  experience, I believe GUTIERREZ operated as a look-out during the transaction, CANO was involved

10  in driving the narcotics to the location, and CERVANTES was responsible for delivering the narcotics to

11  CI-3.

12        ***14.      October 30, 2019: Purchase of 446 Grams Methamphetamine from
                    CERVANTES, GUTIERREZ, and CRUZ***

13

14        49.      During the above-described transaction occurring on October 30, 2019, CERVANTES

15  advised CI-3 that he could get a "whole p" (i.e., one pound of methamphetamine) for $2,700 from his

16  source, but that CERVANTES would sell it to the CI for $2,900.  CI-3 and CERVANTES negotiated the

17  price of the pound.  After leaving the parking lot, CI-3 called CERVANTES to arrange the purchase of

18  the pound of methamphetamine.  They agreed to meet later that same day at 3701 Treat Boulevard in

19  Concord, CA.

20        50.      Surveillance units then observed CRUZ arrive in the parking lot in a green Honda and

21  park next to CI-3's vehicle.  CI-3 entered the green Honda and observed CERVANTES in the front

22  passenger seat and GUTIERREZ in the rear passenger seat, and CRUZ in the driver seat.  CI-3 gave

23  $2,850 to CERVANTES, who then handed the money to CRUZ, who counted the bills.  CERVANTES

24  then handed **446 grams (net weight) methamphetamine** to CI-3.

25  ///

26  ///

27

28

1

2

### 15.   *December 4, 2019: Purchase of Beretta Firearm from GUTIERREZ that Links Back to Two Homicides and a Shooting*

3

51.     Prior to approximately December 4, 2019, GUTIERREZ contacted CI-1 and advised that

4   he (GUTIERREZ) had a 9mm handgun for sale for $600.  During the conversation, GUTIERREZ

5   explained he could not keep this firearm at his house.  GUTIERREZ also asked if CI-1 could pick up the

6   firearm that day and pay him later.  Based on the conversation, I suspected the firearm for sale to have

7   been used in a crime as GUTIERREZ did not want to hold onto the firearm so he was willing to provide

8   it to CI-1 without first securing payment.  Soon thereafter, CI-1 coordinated the purchase of the firearm

9   on with the assistance of CI-2 from GUTIERREZ.

10

52.     On or about December 4, 2019, GUTIERREZ gave CI-2 a Beretta 9mm firearm in

11   exchange for $600 after meeting in the Food Maxx parking lot at 1751 Monument Boulevard in

12   Concord, CA.  During the transaction, GUTIERREZ advised that he (GUTIERREZ) had a "partner"

13   who had additional firearms for sale.

14

53.     The Contra Costa County crime laboratory used ballistics evidence to match the Beretta

15   firearm to spent shell casings recovered from the scene of a homicide in Concord, CA.  The firearm was

16   also correlated to shell casings recovered from a homicide in Richmond, CA, and a shooting in Concord,

17   CA.  These connections show that – at a minimum – one or more of the defendants are involved in

18   moving firearms connected to homicides occurring in the Bay Area.

19

54.     For example, as described above, the Beretta ties back to a homicide, which occurred in

20   Concord, CA on or about November 13, 2019.  During the incident, the victim was the driver of a

21   vehicle traveling down the street when he was shot and killed by a pedestrian that fired at the vehicle.

22   The primary suspect in the murder investigation (herein, the "Murder Suspect") is a known active

23   member of the Brown Pride Locos, which is a subset of the Sureño criminal street gang.  The Murder

24   Suspect was observed fleeing the scene by witnesses and/or surveillance footage.  At the scene, CPD

25   officers recovered four 9mm spent shell casings at the scene of the homicide.  During the subsequent

26   investigation, CPD Detectives executed a search warrant and located a 9mm shell casing.  The firearm

27

28

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

22

1 | involved in the homicide was not located.

2 |     55.    Later, the Contra Costa County crime laboratory analyzed the Beretta firearm purchased

3 | by CI-2, the shell casings recovered from the scene from the homicide, and the shell casing recovered

4 | during the search warrant execution. The Contra Costa County crime lab informed me that the shell

5 | casings from the Concord homicide and the search warrant execution were correlated to the shell casings

6 | recovered in a prior Richmond homicide and prior Concord shooting.  Additionally, the crime lab

7 | determined all the recovered shell casings were fired from the Beretta firearm, which was purchased

8 | from GUTIERREZ.

9 |     56.    Based on the above events, I believe GUTIERREZ likely knew that the firearm had been

10 | used in one or more crimes.  Further, I believe that GUTIERREZ likely assisted the Sureño gang by

11 | finding a buyer for this firearm to remove it from the Concord area to avoid discovery by law

12 | enforcement and homicide investigators.  Thus, I believe GUTIERREZ and others likely worked

13 | together to dispose of homicide evidence linked to gang member activities.

14 |     **16.**    *January 3, 2020: Purchase of 55.8 Grams Methamphetamine from NAVARRO*

15 |

16 |     57.    On or about **January 3, 2020**, in Concord, CA, NAVARRO sold Concord-CI **55.8 grams**

17 | **(net weight) methamphetamine** in exchange for $400.  During the transaction, NAVARRO got into

18 | Concord-CI's car and asked if he/she wanted one or two ounces.  When Concord-CI responded that

19 | Concord-CI wanted two, NAVARRO said he would get another one and instructed Concord-CI to drive

20 | his house on Nicholas Drive.  Instead, Concord-CI told NAVARRO that he/she will wait for

21 | NAVARRO to return.  NAVARRO exited the car and went inside his house before returning to

22 | Concord-CI's car and handing Concord-CI three bags containing 55.8 grams (net weight)

23 | methamphetamine.

24 | ///

25 | ///

26 | ///

27 |

28 | TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

1

2

### 17.   *February 12, 2020: Purchase of 20.937 Grams Methamphetamine and a Pistol from MISSIEGO and NAVARRO*

3    58.   On or about **February 12, 2020**, CI-4 approached MISSIEGO in the parking lot at 1500

4  Monument.  MISSIEGO told CI-4 that his name was "Lil Neto" and that he was a Sureño gang member.

5  MISSIEGO and CI-4 discussed the price of methamphetamine and MISSIEGO provided a small plastic

6  bag of methamphetamine in exchange for $10.  MISSIEGO advised that the price of an ounce of

7  methamphetamine would be negotiable if CI-4 would "cop a lot" (i.e., if CI-4 would be a frequent

8  customer) and vouched for the quality of the drugs.  MISSIEGO also told CI-4 that he had a pistol that

9  he could sell CI-4.

10    59.   After leaving the parking lot, CI-4 contacted MISSIEGO and arranged to purchase an

11  ounce of methamphetamine and a firearm from MISSIEGO.  MISSIEGO told CI-4 that his "dude"

12  wanted $350 for the methamphetamine.  After coordinating the transaction, surveillance units observed

13  MISSIEGO go to NAVARRO's home in Concord, CA.  NAVARRO left the house and spoke with

14  MISSIEGO at MISSIEGO's car before placing something inside the vehicle.  Prior to meeting with

15  NAVARRO, MISSIEGO texted CI-4 and advised that the sale would happen at the same location, and

16  that he was "picking it up [right now]."  MISSIEGO then met CI-4 in the parking lot of 1500 Monument

17  Boulevard, where MISSIEGO sold CI-4 **20.937 grams (net weight) methamphetamine** and a **Ruger**

18  **pistol** for $1,300 total.  Based on my training and experience, I believe MISSIEGO was likely supplied

19  drugs to sell to CI-4 by NAVARRO.

20

### 18.   *February 12, 2020: Purchase of Firearm from MAGAÑA and MISSIEGO, and Contacts Regarding Purchase of Controlled Substances with MIDDLETON*

21

22    60.   Between approximately February 11, 2020, and February 12, 2020, CI-1 attempted to

23  coordinate the purchase of a quarter-pound of methamphetamine and a firearm from MAGAÑA.  I know

24  that MAGAÑA is an active member of the Beach Flats Sureño (BFS) subset.  MAGAÑA has admitted

25  to a CPD detective that he is an active member of the BFS subset.  In addition, I have viewed

26  photographs of MAGAÑA, including several posted to MAGAÑA's Instagram account and included in

27

28

1   this affidavit – wherein MAGAÑA displays Sureño gang hand signs, wears Sureño gang clothing, and

2   outwardly promotes the gang.

3       61.     During CI-1's communications with MAGAÑA, they negotiated prices for the

4   methamphetamine and firearm.  MAGAÑA told CI-1 that he had the firearm, but that they would need

5   to get the methamphetamine from a "home girl" in Pittsburg, CA.  MAGAÑA subsequently advised CI-

6   1 that his "homie" didn't have the gun anymore and had sold it for $1,000.  (Of note, "homie" is a term

7   frequently used by Sureño gang members to refer to one another.)  In response, CI-1 asked MAGAÑA if

8   MAGAÑA could get CI-1 another firearm.  MAGAÑA told CI-1 to "[a]sk neto hes on the corner."

9   MAGAÑA clarified that he was talking about "Lil Neto" (i.e. MISSIEGO) and provided MISSIEGO's

10  phone number to CI-1.  MAGAÑA also gave MIDDLETON's phone number to CI-1 and referred to

11  MIDDLETON as "China" and "his home girl wit the jale."  I know from my training and experience

12  that "jale" is a Spanish slang term for drugs.  I believe it is significant that MAGAÑA referred CI-1 to

13  MISSIEGO and MIDDLETON to arrange for drug and firearm transactions because it is consistent with

14  Sureño gang members conspiring and working together to engage in illegal activities.

15      62.     On or about February 12, 2020, CI-1 contacted MIDDLETON at the number provided by

16  MAGAÑA and asked to purchase a quarter pound of methamphetamine.  MIDDLETON explained that

17  CI-1 would need to come to Pittsburg because her "dude" would have to drop it off at her hotel.  The

18  transaction did not occur that day.

19      63.     That same day, as described further below, CI-1 contacted MISSIEGO at the number

20  provided by MAGAÑA and asked to purchase a firearm and methamphetamine.  MISSIEGO explained

21  that he had just sold a firearm, but had a customized 1911-style firearm for sale, which CI-1 could view

22  on "Villain's story."   Based on my training and experience, I know that Instagram social media users

23  often post "stories," which are temporary photographs or short video clips that are separate from the

24  user's feed, but can viewed by one's account followers.

25      64.     I am advised by a CPD detective that he viewed a story posted to MAGAÑA's Instagram

26  account on February 10, 2020, which depicted MAGAÑA in the front passenger seat of a vehicle driven

27

28

by MISSIEGO.  There is also an unidentified Hispanic male in the backseat of the vehicle.  MISSIEGO

can be seen in the videos displaying the South Side Locos gang hand sign. In the videos, it appears

MAGANA is in possession of the Ruger and 1911 firearms.  Stills from the videos are depicted below:

  

65.     On or about February 12, 2020, MISSIEGO agreed to sell the 1911-style firearm and an

ounce of methamphetamine to CI-1, but when CI-1 arrived at the predetermined meeting location,

MISSIEGO said he would have to get the methamphetamine from elsewhere.  MISSIEGO subsequently

sold CI-1 a 1911-style firearm, but CI-1 did not wait for MISSIEGO to return with the drugs.

66.     MAGAÑA later contacted CI-1 and requested that CI-1 pay him in exchange for

connecting CI-1 to MISSIEGO and MIDDLETON.  On or about May 15, 2020, CI-1 paid MAGAÑA

$100.  MAGAÑA told CI-1 that he had a .40 caliber firearm for sale and he would try to get it for CI-1.

MAGAÑA said that if he was able to help CI-1 acquire another gun, the CI would pay him more.

MAGAÑA's desire for money for connecting CI-1 to MISSIEGO and MIDDLETON is consistent with

MAGAÑA seeking a cut of a drug transaction that he knows occurred with one of his co-conspirators.

///

///

///

1

### 19.   *February 27, 2020: Attempted Purchase of Methamphetamine from MISSIEGO and CABRERA*

2

3    67.    On or about February 27, 2020, CI-5 and CI-6 traveled to 1500 Monument, and

4    approached a group of males in the parking lot, including CABRERA and MISSIEGO.  One of the CIs

5    told MISSIEGO that they were looking for drugs.  CABRERA instructed the CIs to move their car to a

6    different parking spot, and then CABRERA and MISSIEGO got into the CIs' car.  A large portion of the

7    conversation during this meeting was in Spanish.  A Spanish-speaking CPD Detective provided a

8    summary translation, which follows below:

9    68.    CABRERA identified himself as "Guero" from Monkey's Trece (i.e., Los Monkey Trece,

10   Sureño Criminal Street Gang out of Brentwood/Antioch area) and shook hands with both CIs.

11   CABRERA said he is from "Pita," which is slang for the City of Pittsburg, but that his "homie" (i.e.,

12   fellow gang member MISSIEGO) was from the area and this was his "hood" (i.e., his gang subset's

13   territory).  CI-5 asked CABRERA how much for a pound of narcotics, referring to methamphetamine.

14   CABRERA said, "You want a pound?"  CI-5 responded affirmatively.  MISSIEGO then interjected in

15   the conversation.  During the conversation CABRERA asked the CIs if they knew "Viejon."  I know

16   "Viejon" is moniker for Armando NAVARRO.  One of the CIs stated that their supplier was not

17   trustworthy and lied to him/her, and that the supplier's prices were too high.  MISSIEGO then asked the

18   CIs how much the CIs wanted to pay for an ounce.  In response, MISSIEGO was asked to name his

19   price.  MISSIEGO stated $300-$400.  Next, the CIs also expressed interest in the "white stuff" (i.e.,

20   cocaine) and CABRERA responded using the word "soda" (i.e., another slang term for cocaine).

21   CABRERA told the CIs that he could get them connected and give them product on a daily basis.

22   69.    A transaction did not ultimately occur on this date, after CABRERA asked the CIs to do

23   cocaine in order to prove they were not police.

24   ///

25   ///

26   ///

27

28   TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

27

### *20. March 11, 2020: Purchase of 7.126 Grams Methamphetamine from CERVANTES, MAGANA, and RAMIREZ-CARRANZA*

70.     On or about **March 11, 2020**, CI-2 went to 1500 Monument Boulevard and met with MAGAÑA, RAMIREZ-CARRANZA, and CERVANTES in the parking lot.  CI-2 asked if they had methamphetamine and RAMIREZ-CARRANZA responded that they did and they could get CI-2 anything he/she wanted.  MAGAÑA asked what CI-2 wanted, and CI-2 asked for a quarter-ounce of methamphetamine.  MAGAÑA asked if CI-2 meant two eight-balls, and CI-2 said yes.  CERVANTES stated that he had a quarter-ounce left that he could sell.  CI-2 asked how much it would cost, and MAGAÑA responded that it would be $125-$130.  CI-2 asked if MAGAÑA would sell it for $120, and MAGAÑA agreed.  MAGAÑA then nodded at CERVANTES, who stood up and walked away before getting into a pickup truck.

71.     While CERVANTES was gone, RAMIREZ-CARRANZA asked CI-2 if he/she was still buying "things," "big ones," which I know to be terms for firearms.  RAMIREZ-CARRANZA told CI-2 to come by 1500 Monument any time and that anyone would be able to help him.  MAGAÑA told the CI that he had sold an eight-ball to someone earlier for $150, and that CERVANTES was "hooking [CI-2] up."  RAMIREZ-CARRANZA and MAGAÑA described the location as a "one stop shop," and told CI-2 that they're there every day, and that if they're not there, someone there would be able to get CI-2 whatever he/she wanted.

72.     Based on my training and experience, I believe RAMIREZ-CARRANZA and MAGAÑA were explaining to CI-2 that he/she could come to 1500 Monument on any day and would find Sureño gang members at the location.  Further, I believe they were expressing that Sureño gang members worked together to sell a variety of drug types and firearms.

73.     CERVANTES then returned and walked to CI-2's car.  CERVANTES handed CI-2 **7.126 grams (net weight) methamphetamine**.  CI-2 asked CERVANTES if it was a "quarter," and CERVANTES responded that it was.  CI-2 asked if it cost one hundred, and CERVANTES confirmed that the price was $120.  CI-2 then handed $120 to CERVANTES.  CERVANTES told CI-2 that if

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

he/she came back, "anyone will have what you need." CERVANTES gave CI-2 his number and called himself "Bam Bam." CERVANTES also explained that CI-2 could come to 1500 Monument at any time to buy more drugs and there would be a "homie" there. CERVANTES explained the "homies" were going to have whatever the CI-2 needed. Once again, I believe that CI-2 was informed that Sureño gang members (who commonly refer to each other as "homies") would supply drugs to CI-2 at this location area. Additionally, CERVANTES told CI-2 to approach a "homie" and give them "the nod." CERVANTES told CI-2 that once he/she gave them a nod, they would give CI-2 whatever he/she needed.

### 21. March 20, 2020: Purchase of 54.378 Grams Methamphetamine from MAGAÑA and MIDDLETON

74. On or about **March 20, 2020**, CI-2 purchased approximately two ounces of methamphetamine for $1,100 from MAGAÑA in Concord/Pleasant Hill, CA. CI-2 initially met with MAGAÑA at the parking lot of the Seven Star Market at 1500 Monument Blvd, Concord, CA. At this location, CI-2 negotiated with MAGAÑA to purchase methamphetamine. MAGAÑA said he charged $550 per ounce of methamphetamine. MAGAÑA explained the prices were high due to the COVID 19 pandemic. MAGAÑA and CI-2 agreed to meet later to conduct the transaction at a location in Pleasant Hill, CA.

75. Later, MAGAÑA arrived at the Pleasant Hill location in a green Ford Expedition driven by MIDDLETON. MAGAÑA got into CI-2's car and provided **47.612 grams (net weight) methamphetamine** in exchange for $1,100 from CI-2. After weighing the methamphetamine, it was later determined that the amount was seven grams short of the agreed-upon amount. CI-2 contacted MAGAÑA and MAGAÑA agreed to make up the difference. They then met again, this time at 1500 Monument Boulevard, where MAGAÑA provided **7.126 grams (net weight) methamphetamine** to CI-2.

///

///

1
2

      22.     **_March 27, 2020: Purchase of 83.092 Grams Methamphetamine from_**
              **_MIDDLETON_**

3
4
5
6
7
8
9
10

76.     On or about **March 27, 2020**, CI-3 contacted MIDDLETON to coordinate the purchase of two ounces of methamphetamine.  MIDDLETON advised CI-3 that she was with "Smiley from SSL" and a couple of other "homies."  MIDDLETON advised that she only had one ounce on her and would need CI-3 to front her money in order to obtain the second ounce from her supplier.  CI-3 requested to buy just the one ounce and coordinated to meet with MIDDLETON at the Motel 6 in Pittsburg, CA.  During this call, MIDDLETON told CI-3 that prices were expensive now and that one ounce would cost $200.  MIDDLETON further advised CI-3 that if CI-3 wanted the second ounce, CI-3 could wait in MIDDLETON's motel room with MIDDLETON's children while she picked up the second ounce.

11
12
13
14
15

77.     MIDDLETON told CI-3 to meet her at her motel room.  In a subsequent call, CI-3 asked if they could meet in a nearby parking lot instead, and MIDDLETON agreed.  CI-3 met MIDDLETON in the parking lot where MIDDLETON arrived driving a green Ford Expedition.  MIDDLETON gave CI-3 approximately one ounce methamphetamine in exchange for $200.  MIDDLETON told CI-3 that she supplied "Villain," which I know is MAGAÑA's moniker.

16
17
18
19

78.     MIDDLETON then advised CI-3 that she was going to pick up another ounce.  A short while later, MIDDLETON contacted CI-3, confirmed a two ounce deal with him/her, and told CI-3 to meet her at a gas station in Martinez, CA.  At this location, MIDDLETON handed CI-3 approximately two ounces of methamphetamine in exchange for $400.

20

79.     In total, MIDDLETON sold **83.092 grams (net weight) methamphetamine** to CI-3.

21
22

      23.     **_May 6, 2020: Purchase of 0.431 Grams Methamphetamine from_**
              **_PEREZ_**

23
24
25
26

80.     On or about **May 6, 2020**, CI-2 coordinated the purchase of methamphetamine from PEREZ.  I know that PEREZ is an active SSL member.  PEREZ has several gang-related tattoos including one dot on his right elbow and three dots on his left elbow.  During the course of this investigation, PEREZ has frequently been observed in the company of other SSL members at 1500

27
28

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

Monument Boulevard.  PEREZ' Instagram account name is "cbz.557".  I know based on my training and professional experience that "557" is in reference to SSL as "557" is an inverted notation for "SSL." In the month of July 2020, PEREZ posted a video on his Instagram account that appeared to depict him in a vehicle with CANO.  PEREZ posted the caption "SSL GANG MY BOY."

81.     In September 2018, PEREZ also posted the following picture to his Instagram account, depicting PEREZ, MISSIEGO, and three other individuals.  In the photo: MISSIEGO is wearing a blue and white shirt with the number 80 on it and PEREZ is wearing a sleeveless black tanktop.  Of note, individuals depicted in the photograph are making a "3" and "M" gang signs.



82.     On or about May 6, 2020, CI-2 arrived at 1500 Monument and approached PEREZ.  CI-2 asked PEREZ where the "homies" were.  PEREZ responded that he was a "homie."  CI-2 asked PEREZ if it was "good" (i.e., whether or not PEREZ could sell drugs to CI-2).  PEREZ responded, "Yeah, what you need?"  CI-2 responded, "crys" (i.e., crystal methamphetamine).  PEREZ stated that he did not currently have any.  CI-2 then walked into a nearby liquor store.

83.     When CI-2 exited the store, PEREZ approached CI-2 and asked how much CI-2 wanted. CI-2 stated that he/she wanted an ounce.  PEREZ then walked over to a group of three unidentified

1  Hispanic male adults on the east side of the liquor store.  Shortly after, PEREZ walked back to CI-2 and

2  told CI-2 that he could only get a "dub" (i.e., $20 worth of methamphetamine).

3      84.    PEREZ told CI-2 that the "homie" that usually has it was not there right now.  CI-2 asked

4  PEREZ if he had any cocaine.  PEREZ said the "homie" that has the cocaine recently left the area.  I

5  know that surveillance unit had observed RAMIREZ-CARRANZA leave the location shortly before this

6  interaction.

7      85.    PEREZ told CI-2 that he would call the "homie" and see if he could get some, and that CI

8  -2 should come back.  PEREZ told CI-2 to come back later.  CI-2 then got back in his/her vehicle.  As

9  CI-2 drove past PEREZ, CI-2 said he/she would purchase the "dub."  CI-2 parked in front of the liquor

10  store.  PEREZ approached the driver's side window and told CI-2 that he was going to get the

11  methamphetamine.  PEREZ then approached the driver side of CI-2's vehicle and handed him/her **0.431**

12  **grams (net weight) methamphetamine** in exchange for $20.  PEREZ told CI-2 to come back later for

13  more.  CI-2 departed the area.

14      86.    A short while later, CI-2 returned to 1500 Monument Boulevard and parked his/her

15  vehicle near the liquor store.  PEREZ approached CI-2's vehicle.  CI-2 asked if it was "good."  PEREZ

16  told CI-2 that he/she just missed the "homie" (i.e. the gang member with the type of drugs that CI-2

17  wanted to purchase).  PEREZ offered to call his homie to see if he was coming back to the area.  A short

18  time later, PEREZ contacted CI-2 and said they were not going to be able to do an additional

19  transaction.

20      87.    When CI-2 asked PEREZ for his phone number, PEREZ told CI-2 that his phone only

21  worked on wi-fi, but that he was always at 1500 Monument Boulevard and CI-2 could reach him there.

22      88.    Based on my training and experience, I believe PEREZ's efforts to secure an additional

23  drug deal with CI-2 by referencing his "homie" is consistent with Sureño gang members working

24  together at 1500 Monument to sell a variety of drugs to their customers.

25  ///

26  ///

27

28  TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
    [**UNDER SEAL**]

### 24.   *May 8, 2020: Attempted Purchase of Methamphetamine from CABRERA*

89.     On or about May 8, 2020, CI-3 met with CABRERA at the same Motel 6 in Pittsburg, CA, described above. CI-3 told CABRERA that CI-3 was a friend/customer of "China," which is MIDDLETON's moniker. CI-3 asked to buy methamphetamine from CABRERA. CABRERA told CI-3 that he was selling methamphetamine for $300 an ounce, and provided his phone number to CI-3. CI-3 attempted to coordinate the purchase of methamphetamine that day, but CABRERA advised that he had to make some calls and it would take five minutes to an hour in order to obtain the methamphetamine. CI-3 departed the area without purchasing controlled substances.

### 25.   *May 14, 2020: Purchase of 2.888 Grams Methamphetamine from CANO*

90.     On or about **May 14, 2020**, CI-1 went to 1500 Monument Boulevard, and observed several men in the parking lot. CI-1 greeted two individuals whom he knew from prior contacts. CANO introduced himself to CI-1 as "Vaca from South Side Locos." CI-1 asked CANO if CANO had any "crys" (i.e. methamphetamine). CANO told CI-1 that he had half an ounce of methamphetamine, but when the CI-1 asked how much CANO would sell it for, CANO advised that he would only sell CI-1 a "ball," for $60. CI-1 agreed. CANO then walked away with another man. CANO then returned and told CI-1 to get into CI-1's car. At the vehicle, CANO handed the CI **2.888 grams (net weight) methamphetamine** in exchange for $60.

### 26.   *May 15, 2020: Purchase of 117.817 Grams Methamphetamine from CANO*

91.     On or about **May 15, 2020**, CI-1 coordinated the purchase of a quarter pound of methamphetamine from CANO via phone. CI-1 and CANO met in the FoodMaxx parking lot at 1751 Monument Boulevard in Concord, CA, where CANO handed a bag of methamphetamine to CI-1 in exchange for $1,000. After leaving the location, CI-1 provided the methamphetamine to ATF, and the methamphetamine weighed approximately one ounce less than agreed. CI-1 contacted CANO, and CANO agreed to make up for the shorted amount. CANO and the CI met in the parking lot of a Panda Express in Pleasant Hill, CA. CANO approached CI-1's vehicle and provided another bag of

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

1    methamphetamine to him/her.  CANO told CI-1 that the bag had "28 grams on that one."  CANO

2    indicated that the mistake was on the part of his source, with whom he was going to meet afterwards.

3         92.     In total, CANO sold **117.817 grams (net weight) methamphetamine** to CI-1.

4              ***27.    *May 15, 2020: Purchase of 111.4 Grams Methamphetamine from CABRERA***

5         93.     Between approximately May 12, 2020, and May 15, 2020, CI-3 coordinated the purchase

6    of approximately four ounces of methamphetamine from CABRERA via phone.  They arranged to meet

7    at the Motel 6 in Pittsburg, CA.  On or about **May 15, 2020**, CI-3 and CI-1 went to the Motel 6 and

8    called CABRERA when they arrived.  CABRERA said he would be there in 15 minutes, so the CIs left.

9    CABRERA called the CIs back and told them to return, and stated that his source was arriving shortly.

10   The CIs returned to the motel and CABRERA got into the CIs' vehicle.  CABRERA then gave CI-3

11   **111.4 grams (net weight) methamphetamine** in exchange for $1,200.

12             ***28.    May 28, 2020 Purchase of 0.549 Grams Cocaine from RAMIREZ-CARRANZA***

13        94.     On **May 28, 2020**, in the parking lot of 1500 Monument Boulevard in Concord, CA, CI-3

14   purchased **0.549 grams (net weight) cocaine** from RAMIREZ-CARRANZA in exchange for $70.

15   During that transaction, CI-3 met with RAMIREZ-CARRANZA and GUTIERREZ in the parking lot.

16   While RAMIREZ-CARRANZA left in a black sedan driven by Individual-2 to obtain the requested

17   drugs, CI-3 spoke with GUTIERREZ about purchasing methamphetamine.  GUTIERREZ told CI-3 that

18   if he/she returned the next day, GUTIERREZ would have an ounce of methamphetamine for CI-3.

19   Later, the black sedan returned and drove out of view of the pole camera.  Shortly after, RAMIREZ-

20   CARRANZA walked towards CI-3 from the direction in which the vehicle had gone, and provided the

21   cocaine to CI-3 in exchange for $70.

22             ***29.    May 29, 2020: Purchase of 13.672 Grams Methamphetamine from RAMIREZ***
             ***CARRANZA and GUTIERREZ***

23

24        95.     On **May 29, 2020**, CI-2 went to 1500 Monument Boulevard, and approached RAMIREZ-

25   CARRANZA, who asked if CI-2 was trying to get "some" (i.e., buy drugs).  CI-2 responded

26   affirmatively, and asked to buy a half-ounce of methamphetamine.  CI-2 asked if the drugs were ready,

27

28   TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
     [**UNDER SEAL**]

1   and RAMIREZ-CARRANZA looked towards GUTIERREZ and stated, "Let me holla at my boy."

2   GUTIERREZ and RAMIREZ-CARRANZA then got into a truck together and talked.  Next,

3   GUTIERREZ then got out of the truck and walked away as CI-2 approached.  RAMIREZ-CARRANZA

4   then gave **13.672 grams (net weight) methamphetamine** to CI-2 in exchange for $300.  Based on my

5   training and experience, I believe that GUTIERREZ supplied RAMIREZ-CARRANZA with the drugs

6   to sell to CI-2.

7               ***30.***     ***May 29, 2020 Purchase of 0.598 Grams Methamphetamine from ALVARENGA***

8               96.     That same day, CI-3 went to the same location and asked if "Faja" (GUTIERREZ) or

9   "Chino" (RAMIREZ-CARRANZA) were around.  CI-3 spoke with GUTIERREZ indicating he/she

10  came to purchase methamphetamine, GUTIERREZ advised "they" didn't bring him anything and he

11  was "down to his last little bit."  CI-3 then approached a group of males, including ALVARENGA and

12  CANO, in the parking lot.  I know that ALVARENGA is an active SSL member.  ALVARENGA has

13  admitted to a CPD detective that he is an active member of the SSL.  The same detective has conducted

14  surveillance on ALVARENGA on several occasions and has observed him with other known Sureño

15  gang members.  The detective also seen photographs of ALVARENGA displaying Sureño gang hand

16  signs.  I also know that ALVARENGA has the following gang related tattoos: "SSL" on his chest and

17  left eye three dots in pyramid shape.

18              97.     ALVARENGA told CI-3 that the guy that CI-3 was talking to yesterday (i.e.,

19  GUTIERREZ) was "over there" and pointed in GUTIERREZ's direction.  When CI-3 told

20  ALVARENGA that GUTIERREZ was "dry" (i.e., out of drugs), but that CI-3 was trying to buy

21  something, ALVARENGA responded that he didn't have any "powder" (i.e., cocaine), but he had the

22  "stronger shit."  Based on my training and experience, I believe ALVARENGA was stating that he only

23  had methamphetamine to sell.  CI-3 told ALVARENGA that he/she wanted to buy an ounce or two, but

24  ALVARENGA told CI-3 that he did not like to carry larger quantities because he just "beat a sales case"

25  (i.e. a drug sales criminal charge was dismissed or reduced to a possession charge).  CI-3 agreed to buy a

26  "dub" from ALVARENGA.  ALVARENGA gave **0.598 grams (net weight) methamphetamine** to CI-

27

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.

28  [**UNDER SEAL**]

1  3 in exchange for $20.  Based on my training, experience, and involvement in the instant investigation, I

2  believe ALVARENGA was working with GUTIERREZ to ensure CI-3, a drug customer at 1500

3  Monument, was provided controlled substances.

### 31. *May 29, 2020: Purchase of 0.881 Grams Cocaine from RAMIREZ-CARRANZA and Individual-2*

6  98.  Later on or about **May 29, 2020**, a DEA CS arrived at the 1500 Monument parking lot

7  and approached Individual-2.  I know that Individual-2 is an active member of the SSL subset.  A CPD

8  detective has conducted surveillance on Individual-2 on several occasions and observed him with other

9  known Sureño gang members.  The CPD detective has also viewed numerous photographs and videos

10  where Individual-2 displayed Sureño hand signs.

11  99.  On May 29, 2020, Individual-2 asked the DEA CS if he/she wanted "soda" (a street term

12  for cocaine).  The DEA CS replied that he/she wanted whatever Individual-2 had to sell.  Individual-2

13  said that he only had "soda," and that he had $100 worth.  RAMIREZ-CARRANZA then asked the CS

14  if the CS wanted the "100," which the DEA CS affirmed.  RAMIREZ-CARRANZA advised that the

15  cocaine was separated into "20s," or five $20 bags.  The CS asked if RAMIREZ-CARRANZA had an

16  ounce, but RAMIREZ-CARRANZA stated that ounces were too expensive right now.  RAMIREZ-

17  CARRANZA then gave **0.881 grams (net weight) cocaine**, split into five bags, to the DEA CS in

18  exchange for $100.  RAMIREZ-CARRANZA told the CS that if the CS ever wanted "more," the CS can

19  come back to the area and meet with them.

20  **VII.   CONCLUSION**

21  100.  Based on the information set forth in the paragraphs above, I submit that there is probable

22  cause to believe that (1) beginning on a date unknown, but no later than April 22, 2019, and continuing

23  through at least May 29, 2020, in the Northern District of California, CRUZ, RAMIREZ-CARRANZA,

24  GUTIERREZ, MAGAÑA, MISSIEGO, CERVANTES, CANO, NAVARRO, MIDDLETON, and

25  CABRERA agreed with each other and with others to distribute and possess with the intent to distribute

26  controlled substances, namely, heroin, cocaine, and 50 grams or more of a mixture or substance

27

28  TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
[**UNDER SEAL**]

1   containing methamphetamine, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B)(viii), and

2   841(b)(1)(C); (2) on or about May 6, 2020, in the Northern District of California, PEREZ sold a quantity

3   of methamphetamine to another individual, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and

4   (3) on or about May 29, 2020, in the Northern District of California, ALVARENGA sold a quantity of

5   methamphetamine to another individual, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).

6        101.    Accordingly, based upon the foregoing, I respectfully request that the Court sign the

7   requested criminal complaint and issue the requested arrest warrants.

8        102.    I declare under penalty of perjury that the statements above are true and correct to the

9   best of my knowledge and belief.

10

11             /s/ Richard Timbang

12            RICHARD P. TIMBANG
              Special Agent
13            Bureau of Alcohol, Tobacco, Firearms and
              Explosives

14

15

16   Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P. 4.1 and 4(d) this

17     8th   day of September, 2020.

18

19

20   HONORABLE DONNA M. RYU
     United States Magistrate Judge

21

22

23

24

25

26

27

28   TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.
     [**UNDER SEAL**]

1

_____

2      ^i ATF CI-1 (herein, "CI-1") is an individual who has worked for CPD, as well as another police department. In exchange, CI-1 has received pecuniary payments for his/her assistance. The information

3    provided to ATF/FBI/Concord PD by CI-1 has, to date, been found to be credible and much of it has been corroborated through contemporaneous recordings, as well as other methods. CI-1 has sustained

4    previous felony and misdemeanor convictions for crimes related to possession of a controlled substance, theft of access card, burglary, exhibiting a deadly weapon not firearm, grand theft, and obstructing a

5    public officer. CI-1 has previous arrest for various offenses, including but not limited to the following: possess/purchase for sale controlled substance, use/under the influence of controlled substance, obstruct

6    public officer, possess controlled substance, possess controlled substance paraphernalia, drive without a license, possess marijuana 1oz or less while driving, possess/sell dangerous weapon, probation violation,

7    theft, petty theft, conspiracy commit crime, possess burglary tools, take vehicle without consent, use or access account info without consent, possess unlawful paraphernalia, robbery, false imprisonment,

8    assault deadly weapon not firearm, burglary, carry concealed dirk or dagger, exhibit deadly weapon not firearm, tamper with vehicle, grand theft, and receive known stolen property. To my knowledge, CI-1 is not presently working in consideration for any pending criminal charges.

9

10      ATF CI-2 (herein, "CI-2") is an individual working with federal and state law enforcement for the purpose of monetary compensation. CI-2 was previously working in consideration for a possible

11    federal drug charge, which was never charged. CI-2 continued to work with law enforcement for financial compensation. The information provided to ATF/FBI/Concord PD by CI-2 has, to date, been

12    found to be credible and much of it has been corroborated, including via review of communications and/or recordings. CI-2 has a previous felony conviction for possess controlled substance for sale. CI-2 has previous arrest for various offenses, including, but not limited to the following: transport controlled

13    substance and possess controlled substance for sale.

14      ATF CI-3 (herein, "CI-3") is an individual working with federal and state law enforcement for the purpose of judicial consideration and compensation. CI-3 is pending sentencing on federal charges

15    involving firearms and drug offenses. The information provided to ATF/DEA/Concord PD by CI-3 has, to date, been found to be credible and much of it has been corroborated through contemporaneous

16    recordings, as well as other methods. The ATF CI 3 has previously been arrested for possession of a controlled substance and has sustained a felony conviction for the drug-related offense.

17

18      ATF CI-4 (herein, "CI-4") is an individual who has worked for ATF and San Mateo Police Department. In exchange, CI-4 has received pecuniary payments for his/her assistance. The information

19    provided to ATF/DEA/Concord PD by CI-4 has, to date, been found to be credible and much of it has been corroborated through contemporaneous recordings, as well as other methods. CI-4 has previous

20    adult felony convictions for theft, residential burglary, possession of marijuana, and juvenile sexual assault (at age 13). Arrests include aggravated assault, damage property, parole violation, resist peace

21    officer, destroy evident, receive stolen property, residential burglary, illegal possession of a weapon by felon, possession of marijuana, and domestic battery.

22      ATF CI-5 (herein, "CI-5") is an individual who has worked for ATF and San Mateo Police Department. CI-5 is currently working for judicial consideration, monetary compensation, and potential

23    immigration benefits, including deferred action on removal. CI-5 has a pending federal gun charge and has not yet been sentenced in connection with this offense. The information provided to

24    ATF/DEA/Concord PD by the ATF CI has, to date, been found to be credible and much of it has been corroborated through contemporaneous recordings, as well as other methods. ATF CI 5 has previous

25    juvenile arrests for carry concealed weapon in vehicle, robbery, assault with a deadly weapon (not firearm), and conspiracy.

26

27      ATF CI-6 (herein, "CI-6") is an individual who has worked for ATF and San Mateo Police

TIMBANG AFF. IN SUPPORT OF CRIMINAL COMPL.

28    [UNDER SEAL]

Department. CI-6 is currently working for judicial consideration, monetary compensation, and potential immigration benefits, including deferred action on removal. CI-6 has a pending federal drug charge and has not yet been sentenced in connection with this offense. The information provided to ATF/DEA/Concord PD by CI-6 has, to date, been found to be credible and much of it has been corroborated through contemporaneous recordings, as well as other methods. CI-6 has previous arrest related to drugs and alien removal under section 212 and 237.

The Concord CI ("Concord-CI") is an individual who worked for a short period of time for CPD. The Concord CI was working for consideration for his/her state cases. The information provided to CPD/ATF by the Concord CI was found to be credible and was corroborated through contemporaneous recordings, as well as other methods. The Concord CI has previous arrest for various offenses, including, but not limited to the following: possess controlled substance, possess burglary tools, possess stolen property, possess controlled substance paraphernalia, possess ID of 10+ persons, take vehicle without consent, possess stolen vehicle, possess switchblade in vehicle, carry concealed dirk or dagger, attempt to receive stolen property, make fictitious check, forge handwriting, manufacture/sale leaded cane, possess controlled substance for sale, get credit use other ID, forgery, possess device to tamper with vending machine, probation violation, appropriate lost property, possess bad check, false checks/records/certificates, possess personal ID with intent to defraud, possess/use vehicle master key, obstruct public officer, commit mail theft, etc.

Since 2019, DEA CS has been working with federal and state law enforcement for the purpose of judicial consideration. The information provided to DEA/ATF/Concord PD by DEA CS has, to date, been found to be credible and much of it has been corroborated, including via review of communications and/or recordings.  Since then, DEA CA has participated in numerous narcotics related investigations and complex conspiracy cases.  DEA CS's information and services have led investigators to numerous federal arrests and narcotics seizures.  The DEA CS has one previous felony charge for possession of a controlled substance for sale.